UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
FRANK J. HOWARD,

                Plaintiff,                <u>MEMORANDUM & ORDER</u>
                                                    21-CV-1020 (JS)

    -against-

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
--------------------------------X

APPEARANCES
For Plaintiff:       Daniel A. Osborn, Esq.
                  Osborn Law P.C.
                  43 West 43rd Street, Suite 131
                  New York, New York  10036

For Defendant:       Scott C. Ackerman, Esq., and
                  Sergei Aden, Esq.
                  Special Assistant U.S. Attorneys
                  United States Attorney's Office
                  Eastern District of New York
                  c/o Office of General Counsel SSA
                  Office of Program Litigation
                  6401 Security Boulevard
                  Baltimore, Maryland  21235

SEYBERT, District Judge:

        Plaintiff Frank J. Howard ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the denial of his application for Social Security Disability Benefits by the Commissioner of Social Security (the "Commissioner"[1]).  (See

---

[1] Herein, the Court may refer to the Social Security Administration as the "Agency".

Compl., ECF No. 1.)   Pending before the Court are Plaintiff's Motion for Judgment on the Pleadings (the "Motion"), and the Commissioner's Cross-Motion for Judgment on the Pleadings (the "Cross-Motion").  (See Motion, ECF No. 11; see also Support Memo, ECF No. 11-1; Cross-Motion, ECF No. 14; Cross-Support Memo, ECF No. 14-1; Reply, ECF No. 15.)   For the following reasons, Plaintiff's Motion is GRANTED, and the Commissioner's Cross-Motion is DENIED.

## BACKGROUND[2]

I.  Agency Procedural History

Plaintiff alleges his disability began on July 18, 2016 (hereafter, the "Onset Date").  (See Compl. ¶5.)  On August 10, 2018, Plaintiff filed for disability insurance benefits.  (R. 68, 149.)  After Plaintiff's claim was initially denied on November 2, 2018 (R. 10), he requested a hearing before an Administrative Law Judge ("ALJ"), which was conducted on February 28, 2020 (hereafter, the "Disability Hearing").  (R. 33.)  Plaintiff was accompanied by an attorney representative (R. 10, 33), and vocational expert ("VE") Michael Dorval testified at the Disability Hearing (R. 33, 59-66).

---

[2]  The background is derived from the Administrative Transcript filed by the Commissioner on August 23, 2021.  (See ECF No. 8.) For purposes of this Memorandum & Order, familiarity with the administrative record is presumed.  Hereafter, the Administrative Transcript will be denoted by the Court as "R".

II.  <u>Evidence Presented to the ALJ</u>

    A.  <u>Overview and General Information</u>

        The Court first summarizes Plaintiff's employment history, relevant medical history, and his testimonial evidence at his disability hearing before the ALJ.  It then turns to the testimony provided by the vocational expert ("VE") at the disability hearing.

        Born in 1960, Plaintiff is a high school graduate. (R. 17, 36.)  After graduating high school, Plaintiff served four years in the U.S. Army.  (R. 36.)  Thereafter, Plaintiff worked more than 30 years as a police officer with the Suffolk County Police Department ("SCPD") in its Marine Bureau.  (R. 36-37, 46.)

        In 2012, due to a 100% blockage of his lower anterior descending artery, Plaintiff suffered a heart attack.  (R. 43-44.) While Plaintiff had a stent procedure, which opened the blockage, the blockage caused significant irreversible damage to his heart. (R. 44.)  For example, thereafter, Plaintiff's ejection fraction ("EF"), a measurement of the percentage of blood leaving the heart each time it squeezes, was well-below the normal range of between 50% and 70%,[3] instead registering between 36% and 41%.  (R.44-45.)

---

[3]  <u>See, e.g.</u>, Mayo Clinic, Ejection Fraction:  What does it measure?, <u>available at</u> <u>https://www.mayoclinic.org/tests-procedures/ekg/expert-answers/ejection-fraction/faq-20058286#:~:text=Ejection%20fraction%20is%20a%20measurement,The%20heart%20squeezes%20and%20relaxes</u> (last visited Aug. 14, 2025).

Plaintiff testified that, as a result, the demands of his job "was getting hard for me." (R. 46; <u>see also</u> id. at R. 47-48 (testifying further to "having more and more problems doing" job tasks, such as lifting patients into helicopters, which "was getting harder and more difficult" for Plaintiff).) He retired from the SCPD in 2016, from which he receives a pension. (<u>See, e.g.</u>, R. 40-41, 54.)

Since his heart attack, Plaintiff engages in a daily cardio workout he learned in rehabilitation (hereafter, the "cardio-rehab"), which workout does not include lifting weights. (R. 48-49.) Plaintiff testified to suffering from an increased feeling of fatigue, which has persisted since his retirement. (<u>See</u> id.) Plaintiff further stated he could walk for approximately ten minutes at a leisurely pace before needing a break. (R. 50.) Similarly, Plaintiff is able to ride an exercise bicycle for five to ten minutes at a time. (R. 51.) And, after about ten minutes of standing, Plaintiff starts to get fatigued. (<u>Id.</u>) Likewise, repetitive actions such as bending down and rising up cause Plaintiff to "tire out quickly". (<u>Id.</u>) Relatedly, Plaintiff testified that his medications cause lightheadedness; therefore, he must be careful with bending. Plaintiff asserts he is able to comfortably lift ten pounds; lifting more than that fatigues him. (R. 49.)

After retiring, from November 2016 through June 2018, Plaintiff sporadically worked for a funeral home, filling in as a pallbearer when the funeral home was short-staffed. (R. 42; see also R. 200.) In doing so, Plaintiff was part of a group of six to eight men who would carry a casket approximately ten to 20 feet, between the hearse and funeral home or church, grasping the casket for approximately five to ten minutes. (R. 200.) However, Plaintiff testified he ceased filling in as a pallbearer because it became too difficult for him. (R. 42.)

Plaintiff completed a function report in September 2018 (hereafter, the "Function Report"). (See R. 185-194.) In said Function Report, among other things, Plaintiff self-reported difficulty: lifting; standing; walking without fatigue; climbing stairs; kneeling; and squatting. (R. 190, 194.) He reported his daily activities included: walking the dog around the block; cardio-rehab; taking a nap; eating; watching television; going on the computer; and reading. (R. 185.) Plaintiff indicted he prepares himself simple breakfasts and lunches and relies upon his wife for cooking, especially for dinner. (R. 187.) Plaintiff also reported: he does light housework; while not often, he may shop for staples (e.g., milk, bread) if running low on them; but, his wife performs the weekly shopping. (R. 188.) Additionally, Plaintiff reported difficulty handling stress, which can cause chest pains. (R. 192-193.) And, since his heart attack,

Plaintiff: needs help with major house repairs; sleeps a great deal during the day; and is more easily tired by his daily activities. (R. 186, 188, 194.)

    B.   <u>Relevant Medical History</u>

       1.  <u>Plaintiff's Providers</u>

Following the 2012 insertion of his stent, Plaintiff had routine follow-up care with Stony Brook Internists and cardiologist Anil Mani, M.D., for medication management and periodic testing. (<u>See</u> R. 263-507.)

Testing in early September 2016 revealed Plaintiff had left ventricular ejection fraction ("LVEF"[4]) of 36% and moderately to severely reduced global left ventricular systolic pressures. (R. 297-298.) The provider noted Plaintiff's "EF does improve with exercise as noticed on his stress nuclear study." (R. 298.)

---

[4]

     Left ventricular ejection fraction (LVEF) is a fundamental measure of left ventricular systolic function, reflecting the percentage of blood ejected from the ventricle with each heartbeat. LVEF serves as a critical marker of myocardial contractility and is among the most reliable predictors of cardiovascular outcomes across all ages and genders. LVEF is crucial in diagnosing and managing a wide range of cardiac conditions, including ischemic heart disease, valvular disorders, cardiomyopathies, and systemic illnesses with cardiac involvement.

Pirbhat Shams, Amandeep Goyal, Amgad N. Makaryus, <u>Left Ventricular Ejection Fraction</u>. (Aug. 26, 2025, 12:27 PM), https://www.ncbi.nlm.nih.gov/books/NBK459131/.

July 2017 testing revealed, <u>inter alia</u>, Plaintiff had: a large severe mid-to-distal anterior, apical, and apical anteroseptal infarction; and, an LVEF of 41%. (R. 540-541, 543.) That same month, Plaintiff reported episodic dizziness when getting up from bending his head down (R. 467); his doctor attributed this to Plaintiff's lower blood pressure caused by his then-current medications, "which [we]re at a low-dose." (R. 470.) The Doctor also recorded Plaintiff had suffered an episode of vertigo, which lasted three days, but which resolved without incident. (R. 467.)

At his December 2017 follow-up visit with Dr. Mani, Plaintiff reported he was "doing well with no complaints of chest pain or shortness of breath" and "remain[ed] active going to the gym", but he "does get occasional lightheadedness with positional change." (R. 271.) In his impressions, the Doctor observed: Plaintiff had an "above average exercise performance" in his stress test, during which Plaintiff did not experience chest pain; and, while Plaintiff "does have a very large defect consistent with his LAD infarct", there was "no evidence of ischemia". (R. 275.) At that time, Plaintiff's LVEF was 41%. (<u>See</u> <u>id.</u>)

At a bi-yearly check-up in March 2019, Plaintiff reported feeling fatigued, telling cardiologist Dr. Jordan Katz, also of Stony Brook Internists, he "always feels tired" and that, while "he is oaky in the AM after waking up", he "has to take a

7

nap later during the day." (R. 538.) Otherwise, Plaintiff reported feeling well and, inter alia, "go[ing] to the gym on a daily basis and work[ing] out for 40 minutes using the treadmill, stationary bicycle[,] and elliptical machine." (Id.) Dr. Katz theorized Plaintiff's fatigue was "[l]ikely multifactorial in origin" considering Plaintiff's prior myocardial infarction with reduced left ventricular systolic function; or, Plaintiff's fatigue could be caused by his medications. (R. 543.) Nonetheless, considering Plaintiff's history of myocardial infarction, Dr. Katz continued Plaintiff on his then-current medicine regime. (See id.)

At his September 2019 follow-up visit with Dr. Katz, Plaintiff stated he had been "feeling well" and was "without any acute complaints". (R. 527.) Again, Plaintiff reported going to the gym "[five] days a week" and working out for 40 minutes at a time "without any problems". (Id.) He also told the Doctor he "usually takes a 30-60 minute nap after working out". (Id.) Dr. Katz noted one of Plaintiff's problems was fatigue. (R. 528.) Cardiovascular findings for Plaintiff were normal. (R. 529.) The Doctor continued Plaintiff on his then-current cardiac medications. (R. 531.)

In March 2020, Dr. Katz completed a cardiac impairment questionnaire regarding Plaintiff (hereafter, the "Questionnaire"). (R. 555-557.) In said Questionnaire, Dr. Katz

indicated: his treatment of Plaintiff began March 12, 2019 and he saw Plaintiff every six months; Plaintiff has heart problems, and his prognosis is fair; Plaintiff's symptoms include chest pain, dizziness, and fatigue; Plaintiff suffers from angina which: is infrequent, is sometimes precipitated by stress, lasts a "few minutes", and may occur twice monthly; Plaintiff suffers from ischemic heart disease; and, Plaintiff's impairments: can be expected to last at least 12 months, and would prevent Plaintiff from retaining the ability to work in a competitive environment—even in a sedentary occupation—on a full-time basis. (R. 555-556.) Dr. Katz's opinion about Plaintiff's retained functional ability to work was based upon Plaintiff's history of fatigue and exertional intolerance. (R. 557.) In addition, Dr. Katz opined, due to his impairments, Plaintiff: would need to rest at unpredictable intervals during an eight-hour workday, three-to-four times per day, with each rest period lasting 15-to-20 minutes; experience "good days" and "bad days"; and, would likely be absent from work more than three times per month. (Id.) Further, Dr. Katz indicated Plaintiff was limited to: being able to sit, stand, and/or walk, for no more than one hour in an eight-hour workday; only occasionally being able to lift and carry items weighing between one-and-five pounds, and six-to-ten pounds; and, never being able to lift and carry items weighing between 11-and-20

pounds, and 21-to-50 pounds.  (Id.)  Dr. Katz found Plaintiff not to be a malingerer.  (R. 556.)

### 2.  Consultants

In addition to his visits with his doctors at Stony Brook Internists, Plaintiff also had an October 2018 physical examination by an Agency-retained consultative doctor, Kanista Basnayake, M.D., a family medicine practitioner.  (See R. 515-518.) Dr. Basnayake reported Plaintiff complaining of "pain with exterior and stress", which pain recedes with rest, and occasional shortness of breath.  (R. 515.)  There was no indication Plaintiff also complained of fatigue.  The Doctor's diagnoses included Plaintiff's history of a 2012 heart attack with two stents and "mild" decreased visual acuity in Plaintiff's left eye; she described Plaintiff's prognosis as "stable".  (R. 518.)  Dr. Basnayake opined Plaintiff was restricted from activities both "requiring fine visual acuity due to mild decreased visual acuity in the left eye" and "requiring mild or greater exertion due to cardiac condition."  (R. 518).

On October 31, 2018, after reviewing Plaintiff's then-available medical records and Dr. Basnayake's opinion, I. Seok, M.D., a state agency medical consultant who did not examine Plaintiff, determined Plaintiff could perform light exertional level work.  (See R. 77.)  Among other things, the medical consultant concluded Plaintiff was able to: occasionally

lift 20 pounds; frequently lift ten pounds; and, stand, walk or sit six hours in an eight-hour workday. (R. 74.)  Dr. Seok determined Plaintiff had no other postural, manipulative, visual, communicative, or environmental limitations. (R. 75).  He found, given Plaintiff's cardiac history, Plaintiff's residual functional capacity ("RFC") "is limited to light work on a sustained basis". (Id.)  On February 12, 2019, Robert Hughes, M.D., another agency medical consultant who did not examine Plaintiff, determined that the "evidence supports [the] RFC in [the] file".  (R. 521).

    C.   The VE's Testimony

        The ALJ presented the VE with three hypotheticals.  For each hypothetical, the VE was (1) to start with the premise that the hypothetical individual was of Plaintiff's age, education, and work experience, and (2) opine whether there were any jobs in the national economy such an individual could perform.  In the first hypothetical, the VE was to further assume the individual could perform work at a medium exertional level.  (R. 60.)  The VE testified the hypothetical individual would be able to perform Plaintiff's past work as a police officer.  (See id.)

        In the second hypothetical, the same presumptions were presented to the VE with the additional consideration that the hypothetical individual had the RFC to perform a full range of light work.  (Id.)  Under that scenario, the VE testified a hypothetical individual could not perform the work of a police

11

officer. (See id.) Instead, because the work of a police officer carried transferable skills to light work, the VE identified the positions of a security guard, gate guard, or a utility investigator (see R. 61.), and explained the police-officer-related skillsets that were transferable to those identified jobs (see R. 62).

In the third hypothetical, which began with the same initial presumptions, the ALJ asked the VE to consider a hypothetical individual limited to sedentary work and whether there were jobs available for such individual. (R. 62.) The VE answered in the affirmative that work as a police officer carries transferable skills to sedentary jobs, identifying: a dispatcher for a security company or police department; a collection clerk; and a complaint clerk, a/k/a a customer service clerk. (R. 63.)

Finally, as to any of the proposed three hypotheticals, i.e., regarding medium, light, and sedentary work levels, the ALJ asked the VE:

> [I]f I was to add the further limitation to any of those hypotheticals that the individual was further limited to work that needs to allow for unscheduled breaks that would exceed 15% of a work schedule, would such an individual still be able to perform the work as a [p]olice [o]fficer, or any of the jobs you cited, or any other jobs?

(R. 65.) The VE testified such an individual would not be able to maintain any competitive work in the economy. (See id.)

III. <u>The ALJ Decision</u>

  In an April 8, 2020 decision, the ALJ found Plaintiff was not disabled (hereafter, the "ALJ Decision"). (R. 10-19; <u>see also</u> <u>id.</u> at 20-22 (List of Exs.).) More specifically, while the ALJ found Plaintiff suffered from the severe impairment of coronary artery disease status post myocardial infarction (R. 13), he also found said impairment did not meet or medically equal "the severity of one of the listed impairments [found] in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1552[,] and 404.1526)" (<u>id.</u> (bold emphasis omitted)). Further, upon the record presented, the ALJ found Plaintiff maintained an RFC to perform light work "as defined in 20 CFR 404.1567(b)". (<u>Id.</u>) The ALJ elucidated that, in making this finding, he:

> considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p. [He] also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c.

(<u>Id.</u> at 13-14.) The ALJ explained he was required to engage in a two-step process when considering a claimant's symptoms: (1) "it must first be determined whether there is an underlying medically determinable physical . . . impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to

produce the claimant's pain or other symptoms"; and (2) "[s]econd, once an underlying physical . . . impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, [the ALJ] must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." (Id. at 14.) Further, as to the second prong of the analysis, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [the ALJ] must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." (Id. (emphasis added).)

The ALJ discounted Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms, as he found "they are inconsistent because while the treatment records suggest some exertional limitations, the treatment record and submissions strongly demonstrate an excellent recovery and response to treatment for coronary artery disease." (R. 14-15.) The ALJ proceeded to highlight Plaintiff returned to "full duty" work as a police officer and, after his 2016 retirement, which was Plaintiff's alleged Onset Date of disability, Plaintiff sporadically worked as a pallbearer. (R. 15.) According to the ALJ:

> Treatment records with cardiology specialist
> . . . include repeated references that
> [Plaintiff] was doing well, had no complaints
> of chest pain or shortness of breath,
> exercising regularly and had unremarkable
> physical exams and diagnostic tests with
> stable results. Further, submissions from
> [Plaintiff] detail a wide variety of daily
> activities, all of which fail to support [his]
> allegations of disability.

(Id. (citing Pl.'s Sept. 2018 Function Report (R. 185-194)).)
While the ALJ proceeded to highlight statements that Plaintiff
"reported no change in effort tolerance" and was "'doing well'
with no complaints of chest pain or shortness of breath and
exercising regularly" (R. 15 (re: Feb. 2017 records, and July 2017
records); see also R. 16 (re: Dec. 2017 records, April 2018
records, Mar. 2019 records, and Sept. 2019 records)), he also
acknowledged Plaintiff "indicated some fatigue with exertion"
notwithstanding "that he continued to go to the gym". (R. 15; see
also R. 16 (re: Oct. 2018 records (Plaintiff reporting "tiredness
with exertion, which has been the case since his myocardial
infarction six years prior" and "he goes to the gym and performs
cardio-exercise to a similar extent as always, but is tired and
naps thereafter"), Mar. 2019 records (Plaintiff reporting "he
always feels tired . . . and takes naps during the day"), and Sept.
2019 records.)

        In reaching his RFC determination, the ALJ found
unpersuasive the March 2020 opinion of Dr. Katz, who opined

Plaintiff would be absent three times per month because of his impairments and his sitting, standing, walking, and weightlifting limitations.  (R. 16.)  According to the ALJ:

> The opinion offered is in stark contrast to a long history of unremarkable physical exams, treatment records with repeated references that [Plaintiff] was doing well with no complaints of chest pain or shortness of breath and daily, regular exercise over an extended period that includes forty minutes of cardiovascular exercise without any problems and an expansive range of daily activities. The opinion offered is inconsistent with [Plaintiff's] return to work as a police officer at "full duty" until 2016 following the 2012 heart attack.

(R. 16.)  Likewise, the ALJ found unpersuasive the "mild or greater exertion" exertional limitations assessed by the consultative doctor, Dr. Basnayake, since they were "vague and nonspecific, inconsistent with unremarkable cardiology exams over an extended period, not supported by treatment records that note regular exercise with repeated references that [Plaintiff] feels well and submissions reporting a wide variety of daily activities, which include no problems with personal care, light household cleaning, and traveling alone."  (R. 17.)  Conversely, the ALJ found the opinion of the non-examining consultant, i.e., that Plaintiff retained "a light exertional capacity", to be persuasive since it was "consistent with the medical record as a whole, including all of the cardiology treatment records that include unremarkable

16

exams and repeated references that [Plaintiff] was doing well." (<u>Id.</u>)

Upon the record presented, the ALJ determined that, due to his impairment, Plaintiff could not perform his past relevant, more exertional work as a police officer. (R. 17.) However, the ALJ also concluded Plaintiff could perform other jobs in the local and national economy, <u>e.g.</u>, security officer; gate guard; and utility investigator; his determination was based, in part, upon the testimony of the VE. (R. 18.) Thus, ultimately, he found Plaintiff "not disabled". (R. 19.)

IV. <u>Post-ALJ Decision</u>

A. <u>Subsequent Procedural History</u>

On January 26, 2021, the Agency's Appeals Council denied Plaintiff's request for review; therefore, the ALJ Decision became the final decision of the Commissioner. (R. 1-3.)

On February 25, 2021, Plaintiff initiated the instant action. (<u>See</u> Compl.) Thereafter, on February 21, 2022, Plaintiff moved for judgment on the pleadings, requesting the case be remanded to the Commissioner. (<u>See</u> Support Memo at 14.) On May 16, 2022, the Commissioner crossed-moved for judgment on the pleadings, asserting the ALJ Decision should be affirmed and this action be dismissed. (<u>See</u> Cross-Support Memo at 21.)

B.    <u>The Parties' Positions</u>

Plaintiff puts forth one overarching argument in support of his Motion:  The ALJ erred in his evaluation of the medical opinion evidence.  (<u>See</u> Support Memo at 10-14.)  More specifically, Plaintiff contends there was not substantial evidence to support the ALJ's conclusions.  (<u>See</u> <u>id.</u> at 11-12; <u>see also</u> Reply at 2-3.) Plaintiff also maintains the ALJ did not properly apply the new regulations because he failed to explain how he considered the supportability and consistency factors when assessing the medical opinions in the record.  (<u>See</u> <u>id.</u> at 12.)  Further, Plaintiff contends the ALJ mischaracterized the evidence, thereby warranting remand.  (<u>See</u> <u>id.</u> at 12-13; <u>see also</u> Reply at 3 (arguing, <u>inter</u> <u>alia</u>, because ALJ discounted Plaintiff's credibility, ALJ was required to explain said discounting with sufficient specificity to enable the reviewing court to decide whether there were legitimate reasons for such discounting and whether ALJ's decision was supported by substantial evidence).)

In response, the Commissioner cross-moves for judgment on the pleadings pursuant to Rule 12(c) asserting: the ALJ Decision should be affirmed; Plaintiff's Motion should be denied; and, thereafter, this action should be dismissed.  (<u>See</u> Cross-Support Memo at 21.)  In opposition to Plaintiff's Motion, the Commissioner asserts "substantial evidence supports the ALJ's evaluation of the opinion evidence in formulating the RFC findings"; therefore,

Plaintiff's arguments to the contrary are without merit." (Id. at
13.)

DISCUSSION

I.   Standard of Review

          In Brown v. Commissioner of Social Security, 708 F. Supp.
3d 234 (E.D.N.Y. 2023), Honorable Kiyo A. Matsumoto of this
District thoroughly and succinctly articulated the standard the
Commissioner must follow in determining a claim of disability, see
id. at 241-42, as well as the standard a reviewing district court
must utilize when a claimant challenges the Commissioner's
determination that the claimant is not disabled, see id. at 242-43.
This Court adopts same and incorporates by reference those
standards herein.

          Generally speaking, in reviewing a final decision of the
Commissioner, a district court must "conduct a plenary review of
the administrative record to determine if there is substantial
evidence, considering the record as a whole, to support the
Commissioner's decision and if the correct legal standards have
been applied." Rucker v. Kijakazi, 48 F.4th 86, 90-91 (2d Cir.
2022) (quoting Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir.
2019)). District courts will overturn an ALJ's decision only if
the ALJ applied an incorrect legal standard, or if the ALJ's ruling
was not supported by substantial evidence. See id. (citing
Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012)).

19

"[S]ubstantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

Additionally,

[f]or claims filed on or after March 27, 2017, [like here,] the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the ALJ will evaluate the persuasiveness of medical opinions and prior administrative medical findings using the following factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion or prior administrative medical finding. See id. §§ 404.1520c(c), 416.920c(c). Of those, the "factors of supportability . . . and consistency . . . are the most important factors." Id. §§ 404.1520c(b)(2), 416.920c(b)(2); see also Loucks v. Kijakazi, No. 21-1749, 2022 WL 2189293, at *1 (2d Cir. June 17, 2022).

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). With respect to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. §§ 404.1520c(c)(1), 416.920c(c)(1). With respect to consistency, "[t]he more consistent a medical opinion(s) or prior administrative

> medical finding(s) is with the evidence from
> other medical and nonmedical sources in the
> claim, the more persuasive the medical
> opinion(s) or prior administrative medical
> finding(s) will be." Id. §§ 404.1520c(c)(2),
> 416.920c(c)(2).

Lena Nicole H. v. Comm'r of Soc. Sec., No. 23-CV-0826, 2024 WL 4133819, at *5 (N.D.N.Y. July 30, 2024); see also, e.g., Michelle C. v. Comm'r of Soc. Sec., No. 23-CV-7144, 2024 WL 1706000, at *5 (S.D.N.Y. Apr. 3, 2024), report and recommendation adopted, 2024 WL 1702127 (S.D.N.Y. Apr. 18, 2024). The most relevant factors in determining the persuasiveness of medical findings are the supportability and consistency factors. See Acheampong v. Comm'r of Soc. Sec., 564 F. Supp. 3d 261, 266 (E.D.N.Y. 2021); see also Navedo v. Kijakazi, 616 F. Supp. 3d 332, 343 (S.D.N.Y. 2022) ("Under the new regulations, the ALJ must 'explain how he considered' both the supportability and consistency factors, as they are 'the most important factors.'" (quoting 20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2) (emphasis added); further citation omitted); Keli Ann D. v. Comm'r of Soc. Sec., No. 23-CV-0765, 2024 WL 3493274, at *5 (N.D.N.Y. July 22, 2024) ("The revised regulations for evaluating opinion evidence place substantial emphasis on both supportability and consistency and require the ALJ to explain the analysis of each of those factors." (emphasis added)). The failure to properly consider and apply the supportability and consistency factors are grounds for remand.

See Schonfeld v. Comm'r of Soc. Sec., No. 21-CV-6053, 2023 WL 2625833, at *13 (S.D.N.Y Mar. 24, 2023); Navedo, 616 F. Supp. 3d at 344 (same; collecting cases).

While the treating physician rule is no longer in effect, courts in this district have held the factors under the new regulations "are very similar to the analysis under the old treating physician rule." Velasquez v. Kijakazi, No. 19-CV-9303, 2021 WL 4392986, at *20 (S.D.N.Y. Sept. 24, 2021) (collecting cases); Navedo, 616 F. Supp. 3d at 344 (same; quoting Velasquez); Cuevas v. Comm'r of Soc. Sec., No. 20-CV-0502, 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) ("[T]he essence of the rule remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar."). For example, when an ALJ considers the medical source's relationship with the claimant, the ALJ must consider: the length of the treating relationship; the frequency of examinations; the purpose of the treatment relationship; the extent of the treatment relationship; and the examining relationship. See 20 C.F.R. § 1520c(c)(3)(i)-(v).

In reviewing the Commissioner's decision:

"[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is warranted where "'there are gaps in the

22

administrative record or the ALJ has applied an improper legal standard'" and where "further findings or explanation will clarify the rationale for the ALJ's decision." <u>Coleson v. Comm'r of Soc. Sec.</u>, No. 18-CV-02862, 2020 WL 1989280, at *3 (E.D.N.Y. Apr. 26, 2020) (quoting <u>Rosa v. Callahan</u>, 168 F.3d 72, 82-83 (2d Cir. 1999)).

<u>Blowe v. Comm'r of Soc. Sec.</u>, No. 19-CV-2658, 2020 WL 3129062, at *4 (E.D.N.Y. June 12, 2020); <u>see also</u> <u>Brown</u>, 708 F. Supp. 3d at 243 ("Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision." (citing <u>Pratts v. Chater</u>, 94 F.3d 34, 39 (2d Cir. 1996)).

II.  <u>The Instant Case</u>

Having thoroughly reviewed the record presented, the Court agrees with Plaintiff that ALJ's RFC assessment is not supported by substantial evidence.  Rather, the ALJ relied upon the opinion of a non-examining consultant, over the opinions of Plaintiff's doctor and an examining consultant physician, in determining Plaintiff is not disabled.  Further, the ALJ mischaracterizing Plaintiff's daily activities, which, in turn, improperly influenced his consideration of Plaintiff's subjective complaints of fatigue, leading to a questionable RFC determination.  In this instance, these issues necessitate remanding the case to the Agency.[5]  <u>See, e.g.</u>, <u>Rivera v. Comm'n of</u>

---

[5]  For clarity:  There are other problems with the ALJ Decision, <u>e.g.</u>, the ALJ's failure to consider the entirety of the VE's testimony, <u>i.e.</u>, that where the hypothetical individual would be

Soc. Sec., No. 19-CV-4630, 2020 WL 8167136, at *14 (S.D.N.Y. Dec. 30, 2020), report and recommendation adopted, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021); see also Brown, 708 F. Supp. 3d at 243.

A.    Reliance on Non-Examining Consultant

This Court has recognized "the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability."

---

off-task more than 15% of a work schedule, such individual would be unable to maintain a full-time job. (Cf. R. 65 (VE's testimony regarding the effect of being off-task greater than 15% of work schedule), with R. 18 (portion of ALJ Decision relying upon VE's testimony, which fails to address VE's testimony regarding effect of being off-task to availability of jobs).)

> Where, as here, the VE's testimony is essential to a finding of disability, failure to address the VE's determination requires remand, and the ALJ, at a minimum, must articulate the reasons for his decision not to follow the VE's determination that Plaintiff would not be able to perform any work in the national economy if []he needed to take unscheduled rest breaks. While it may be that the ALJ presented the final hypothetical to the VE despite the ALJ's disbelief that Plaintiff, in fact, required such unscheduled rest breaks, the ALJ's failure to explain as much requires remand.

Ball v. Astrue, 755 F.Supp.2d 452, 466-67 (W.D.N.Y. 2010) (citing Connor v. Shalala, 900 F. Supp. 994, 1003 (N.D. Ill. 1995) (remanding case where ALJ failed to consider entirety of VE's testimony)); see also, e.g., Hatcher v. Comm'n of Soc. Sec., No. 15-CV-3282, 2017 WL 1323747, at *12 (E.D.N.Y. Mar. 22, 2017); Foster v. Berryhill, No. 16-CV-5541, 2017 WL 3129801, at *5-6 (S.D.N.Y. July 21, 2017). However, having determined remand is warranted for other reasons, the Court declines to address this issue further.

Armstead v. Comm'r of Soc. Sec., No. 20-CV-2841, 2024 WL 5077582, at *15 (E.D.N.Y. Dec. 11, 2024); see also Soto v. Comm'r of Soc. Sec., No 19-CV-4631, 2020 WL 5820566, at *7, and n.20 (E.D.N.Y. Sept. 30, 2020) (collecting cases in footnote).  Indeed, "it is well-settled that without the support of an opinion by an expert who actually examined Plaintiff, the non-examining doctor's opinion cannot constitute substantial evidence supporting an RFC determination."  Poceous v. Comm'r of Soc. Sec., No. 20-CV-4870, 2024 WL 3029197, at *14 (E.D.N.Y. Jun. 17, 2024) (citation modified and citation omitted)).

Here, the ALJ rejected as unpersuasive the opinions of Dr. Katz, Plaintiff's cardiologist, and Dr. Basnayake, an examining consultant physician.  (See ALJ Decision, R. 16-17.) Instead, he found persuasive the opinion of a non-examining medical consultant.[6]  (See id. at R. 17.)  However, in the absence of an

---

[6]  There is an additional issue with the ALJ's reliance on the opinion of the medical consultant.  The ALJ referred to a single medical consultant, but then cited to two different evaluations: one by Dr. Seok (cited as Ex. 2A in the ALJ Decision) and another by Dr. Hughes (cited as Ex. 8F in the ALJ Decision).  The ALJ proceeds to baldly claim both "opinions are consistent with the medical record as a whole" and then "finds the [unidentified, single] opinion offered persuasive."  (R. 17.)  The Court is perplexed; to which opinion does the ALJ refer?  Moreover, in the subsequent opinion by Dr. Hughes, while the non-examining consultant stated the "evidence supports [the] RFC in [the] file" (R. 521), he further included the additional remark: "vocational: sed. RFC will allow".  (Id.)  The Commissioner concedes the "precise meaning of this statement" is "not entirely clear." (Cross-Support Memo at 9 n.5. (emphasis added).)  The Commissioner proffers, "[g]iven the context, it likely refers to a potential

opinion of an expert who actually examined Plaintiff, there is no substantial evidence supporting the ALJ's RFC determination. <u>See</u> <u>Agostino v. Kijakazi</u>, No. 22-CV-7235, 2024 WL 1259247, at *5-6 (E.D.N.Y. Mar. 25, 2024) ("[C]ourts frequently find that RFC determinations that depend entirely on the opinions of non-examining experts and one-time consultative examiners are not supported by substantial evidence." (internal quotation marks omitted)); <u>Fintz v. Kijakazi</u>, No. 22-CV-0337, 2023 WL 2974132, at *6 (E.D.N.Y. Apr. 15, 2023) ("The opinion of a non-examining physician cannot constitute substantial evidence on its own and as such should not be heavily relied upon by an ALJ."). Accordingly, the ALJ erred in relying upon the medical consultant's opinion in making his RFC assessment, thereby warranting remand.

B.   <u>Mischaracterization of Evidence</u>

Plaintiff argues:

> [T]he Commissioner does not appear to dispute that the ALJ mischaracterized some of the evidence.   Instead, the Commissioner contends that the ALJ was not required to accept [Plaintiff]'s testimony and the ALJ, applying the factors set out in 20 C.F.R. §

---

finding of disability via the grid rules <u>if</u> Plaintiff were limited to sedentary work." (<u>Id.</u> (stating further that "neither of the state agency consultants found Plaintiff was limited to sedentary work") (emphasis added).) The Commissioner's post-ALJ Decision supposition is insufficient. <u>See, e.g.</u>, <u>Poceous</u>, 2024 WL 3029197, at *9 (rejecting Commissioner's reliance on <u>post hoc</u> rationalization of the record evidence). It is for the ALJ to adequately explain his decision, including reconciling inconsistencies upon which he relies. As discussed herein, the ALJ failed to do so, thereby necessitating remand.

> 404.1529, found [Plaintiff]'s testimony not
> credible.   However,  if  the  ALJ  discounted
> [Plaintiff]'s   credibility,   the   ALJ   was
> required  to  "explain  the  decision  to  reject
> [Plaintiff's]   testimony   with   sufficient
> specificity to enable the [reviewing] Court to
> decide  whether  there  are  legitimate  reasons
> for   the   ALJ's   disbelief   and   whether   [the
> ALJ's]  decision  is  supported  by  substantial
> evidence."   Here, the ALJ did not do that.

(Reply at 3 (first citing Cross-Support Memo at 20; then quoting
Calzada v. Astrue, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010).)   The
Court  agrees.   It  is  well-settled  "where  [a  court  is]  unable  to
fathom  the  ALJ's  rationale  in  relation  to  evidence  in  the  record,
especially  where  credibility  determinations  and  inference  drawing
is  required  of  the  ALJ,  [a  court]  will  not  hesitate  to  remand  for
further  findings  or  a  clearer  explanation  for  the  decision."
Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (quotations
omitted)).   Such is the case here.

To  begin,  as  a  basis  for  disregarding  Plaintiff's
evolving claim of fatigue, and the persistent and limiting effect
of said fatigue, the ALJ highlighted Plaintiff "returned to 'full
duty' work" after his 2012 heart attack and stent insertion.   (R.
15.)   While that may add support to the conclusion Plaintiff had
an excellent recovery from his 2012 heart attack, as the ALJ stated
(see id. at R.15-16), it does not automatically negate Plaintiff's
escalating  claims  of  fatigue.   Rather,  as  the  evidence  shows,
Plaintiff's complaints of being fatigued did not begin until after

his Onset Date, which was also after he retired from the SCPD. Therefore, the ALJ's reliance on Plaintiff's return to work as weighing against a finding of disability is misplaced.

Continuing, it would not be unreasonable for the nature and extent of Plaintiff's fatigue to evolve, i.e., intensify or worsened, over time. Indeed, it appears, based upon Plaintiff's testimony and later-dated notes in various medical records, that this is what occurred. Yet, in the ALJ Decision, the ALJ glosses over the progression of Plaintiff's complaints of fatigue. However, an ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight." Poceous, 2024 WL 3029197, at *10 (quoting SSR 96-7p, 1996 WL 374186, at *2; emphasis added). Since the ALJ has failed to do so as to Plaintiff's escalating complaints of fatigue, this Court's review of the ALJ Decision is impeded.

Further, to the extent the ALJ relies upon Plaintiff's daily activities of living to support his determination of non-disability, that reliance is unavailing. The ALJ wrote: "[S]ubmissions from [Plaintiff] detail a wide variety of daily activities, all of which fail to support [Plaintiff's] allegations of disability." (R. 15 (citing Function Report).) Plaintiff's

activities of daily living include: being able to independently bathe and dress; his 40-minute cardio-rehab, after which he is tired; walking the family dog; watching television, reading, and using the computer; performing various light housekeeping chores; preparing simple meals for breakfast and lunch; and, occasionally shopping. (R. 14.) Plaintiff also reported hobbies of playing the bagpipes and going to car shows, as well as socializing. (See id.) However, the ALJ did not explain why said activities support the finding of an RFC for light work. Absent such an explanation, the Court is frustrated in understanding how any of these activities overcome Plaintiff's claims of fatigue, which fatigue Plaintiff testified has worsened since 2018, with Plaintiff taking more naps and for longer periods of time. (R. 56-57; see also R. 55.) Nor, for the same reason, is it clear to the Court how these daily activities of life have any relevance to Plaintiff's ability to function in a work setting. See, e.g., Poceous, 2024 WL 3029197, at *11-12 (discussing claimant's daily activities; recognizing daily activities do "not necessarily translate into being able to engage in work-related activities"; collecting cases); see also Mortellaro v. Comm'n of Soc. Sec., No. 19-CV-4868, 2022 WL 900595, at *12-13 (E.D.N.Y. Mar. 28, 2022) (in absence of adequate explanation, finding unpersuasive ALJ's reliance on claimant's generic daily activities as basis to reject treating physician's limitations) (collecting cases). Rather, what is

presented is the ALJ repeatedly highlighting Plaintiff's having unremarkable physical exams during which he reported feeling well and denying any chest pain or dizziness, coupled with simply acknowledging Plaintiff's also reporting being increasingly fatigued. (See R. 15-16.) Certainly, the two scenarios can coexist; it is not necessarily inconsistent to both engage in regular exercise, especially as advised by one's doctor for cardio-rehab purposed, and to experience fatigue, which, over time and for various reasons, may occur with more intensity and frequency. See, e.g., Cabibi v. Colvin, 50 F. Supp. 3d 213, 238 (E.D.N.Y. 2014) ("[I]t is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves" (internal quotation and citations omitted)); see also id. at 239 (finding, where ALJ's decision lacked specificity and failed to meet Agency requirements for evaluating the credibility of a claimant's subjective complaints, remand was required). And, while the record evidence shows Plaintiff regularly exercised, it also includes testimony from Plaintiff that his 40-minute cardio-rehab routine consisted of various segments, which he took slowly, e.g., using the treadmill and an exercise bicycle. (R. 50-51.) However, the ALJ failed to discuss this nuance in Plaintiff's exercise regime; thus, without more, the Court unable to understand the ALJ's

rationale in making his RFC determination and, in turn, his disability decision. Compare, e.g., Lawrence v. Comm'n of Soc. Sec., No. 18-CV-12317, 2020 WL 8815492, at *12 (S.D.N.Y. June 10, 2020) (finding ALJ's characterization of claimant's daily activities flawed because ALJ failed to consider the limitations on said activities, which limitations claimant included in function report cited by ALJ), report and recommendation adopted, 2020 WL 8815488 (S.D.N.Y. June 29, 2020). At bottom, the ALJ has failed to "explain his reasoning in a way that permits the court to 'glean' the basis for his credibility determination", thereby requiring a remand. See, e.g., Hamilton v. Saul, No. 20-CV-0457, 2021 WL 4407873, at *3 (E.D.N.Y. Sept. 27, 2021) (remanding matter where, inter alia, in weighing testimony, ALJ failed to "explain his reasoning in a way that permits the court to 'glean' the basis for his credibility determination"); see also Long v. Berryhill, No. 18-CV-1146, 2019 WL 1433077, at *3 (E.D.N.Y. Mar. 29, 2019) ("[R]emand is appropriate where inadequacies in the ALJ's analysis frustrate meaningful review, such as when the ALJ makes credibility determinations and draws inferences from the record, yet fails to fully explain the basis for them[.]" (internal citations omitted)). Hence, remand is required. See Cichocki, 729 F.3d at 177.

–*–*–*–

Because it has determined remand is required in this instance, "the Court need not and does not reach [the parties'] remaining argument[s] . . . ." Kelly v. Comm'r of Soc. Sec., No. 20-CV-5318, 2024 WL 5120051, *13 (E.D.N.Y. Dec. 16, 2024) (quoting Rowe v. Berryhill, No. 17-CV-0208, 2018 WL 4233702, at *5 (W.D.N.Y. Sept. 6, 2018); further citing Keli Ann D. v. Comm'r of Soc. Sec., No. 23-CV-0765, 2024 WL 3493274, at *7 (N.D.N.Y. July 22, 2024) (same; quoting Rowe); Poceous, 2024 WL 3029197, at *15 n.13 (declining to consider plaintiff's further arguments in support of remand upon finding procedural error by ALJ warranting remand)).

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED:** (1) Plaintiff's Motion (ECF No. 11) is GRANTED; and (2) the Commissioner's Cross-Motion (ECF No. 14) is DENIED; this matter being REMANDED to the Commissioner for a new hearing and decision; and

**IT IS FURTHER ORDERED**, once Judgment has entered, the Clerk of Court is directed to CLOSE this case.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: September 8, 2025
    Central Islip, New York